UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MATTHEW              REGINALD
KAERCHER,

     Plaintiff,

v.

UNKNOWN  ALLEN,  UNKNOWN
SHUTT,  UNKNOWN  LEONARD,
UNKNOWN  WHITE,  UNKNOWN
GREGORY,              UNKNOWN
KRAMMER,             UNKNOWN
RUTHBUM,  UNKNOWN  LOTT,
UNKNOWN            SHRADER,
UNKNOWN    SGT.    SHUTT,
UNKNOWN           JOHNSTON,
UNKNOWN     C/O     SHUTT,
UNKNOWN  DILL,  UNKNOWN
RYDAHL, UNKNOWN BLAIR, and
UNKNOWN    KOHN    in    their
individual and official capacities.

     Defendants.

No.          1:25-cv-00194
Hon.

_____/

## PLAINTIFF'S COMPLAINT AND JURY DEMAND

NOW COMES Plaintiff, Matthew Kaercher, by and through his attorneys,

Oliver Bell Group, and for his First Amended Complaint and Jury Demand alleges

as follows:

1

## INTRODUCTION

1. This is a civil rights complaint filed by Plaintiff, Matthew Kaercher, alleging violations of his statutory and constitutional rights and seeking damages and injunctive relief.

## PARTIES

2. Plaintiff Matthew Kaercher is a person formerly incarcerated by the Michigan Department of Corrections ("MDOC") who, at all times relevant to the facts alleged in this complaint, was incarcerated at the Carson City Correctional Facility ("DRF").

3. Defendant Unknown Allen was, at all times relevant to the allegations in this complaint, the Prison Counselor at DRF assigned to Mr. Kaercher's housing unit.

4. Defendant Unknown Sgt. Shutt was, at all times relevant to the allegations in this complaint, a corrections officer at DRF with the rank of sergeant.

5. Defendant Unknown Leonard was, at all times relevant to the allegations in this complaint, a corrections officer at DRF with the rank of sergeant.

6. Defendant Unknown White was, at all times relevant to the allegations in this complaint, a corrections officer at DRF.

7. Defendant Unknown Gregory was, at all times relevant to the allegations in this complaint, a corrections officer at DRF.

8.  Defendant Unknown Krammer was, at all times relevant to the allegations in this complaint, a corrections officer at DRF.

9.  Defendant Unknown Ruthbum was, at all times relevant to the allegations in this complaint, a corrections officer at DRF.

10. Defendant Unknown Lott was, at all times relevant to the allegations in this complaint, a corrections officer at DRF.

11. Defendant Unknown Shrader was, at all times relevant to the allegations in this complaint, a corrections officer at DRF.

12. Defendant Unknown Johnston was, at all times relevant to the allegations in this complaint, a corrections officer at DRF.

13. Defendant Unknown C/O Shutt was, at all times relevant to the allegations in this complaint, a corrections officer at DRF.

14. Defendant Unknown Dill was, at all times relevant to the allegations in this complaint, a corrections officer at DRF.

15. Defendant Unknown Rydahl was, at all times relevant to the allegations in this complaint, a corrections officer at DRF.

16. Defendant Unknown Blair was, at all times relevant to the allegations in this complaint, a Resident Unit Manager ("RUM") at DRF assigned to Mr. Kaercher's housing unit.

17. Defendant Unknown Kohn was, at all times relevant to the allegations in this complaint, a corrections officer at DRF.

## JURISDICTION AND VENUE

18. This Court has jurisdiction over Mr. Kaercher's claims pursuant to 48 U.S.C. § 1331 as they arise under the Constitution of the United States of America, 42 U.S.C. § 1983, and the Americans with Disabilities Act ("ADA").

19. Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b) because the majority of events giving rise to Mr. Kaercher's claims occurred at DRF which is located within the area administered by the Western District Court.

## FACTUAL ALLEGATIONS

20. Prior to being incarcerated, Mr. Kaercher was an employed certified welder who used his income to support his family, including his wife and children.

21. Mr. Kaercher also suffered from opiate addiction prior to his incarceration, however, while incarcerated he has participated in the Medical Addiction Treatment ("MAT") program.

22. While incarcerated at DRF over the winter of 2018–2019, Mr. Kaercher sustained an injury to his back shoveling snow at the facility, damaging his L1 and L5 vertebrae.

23. Starting on February 4, 2019, Mr. Kaercher was provided with a detail for a cane.

24. Starting on February 7, 2019, Mr. Kaercher was provided with a bottom bunk detail.

25. Furthermore, Mr. Kaercher was also prescribed a low dosage of Gabapentin to mitigate the pain he endured.

26. Despite these details, Mr. Kaercher's injuries persisted, and, on March 14, 2022, Mr. Kaercher underwent a major back operation at Henry Ford Allegiance Hospital.

27. While the surgery was largely successful, Mr. Kaercher had a long road to recovery and his surgeon was considering the removal of some of the hardware that had been installed to improve his quality of life by addressing liquid retention and weakness in his left leg.

28. Mr. Kaercher's surgeon, Dr. Frank La Marka, prescribed him with 800 mg of Gabapentin three times daily for nerve pain, 1000 mg of Robaxin three times daily to relax his muscles, 40 mg of prednisone once daily, 500 mg Ciprofloxacin twice daily, and another antibiotic shot three times daily.

29. Dr. La Marka explicitly instructed Mr. Kaercher to avoid stairs and walking or standing for extended periods of time to permit his back to heal and prevent reinjury.

30. Dr. La Marka told Mr. Kaercher that to accommodate his healing process, DRF needed to, and would provide him with a wheelchair, elevator access, and an aid to help him with mobility.

31. Dr. La Marka provided these instructions to DRF healthcare.

32. When an incarcerated person's medical condition restricts their ability to engage the activities of daily living, a qualified health professional at the facility they are incarcerated identifies the accommodations necessary to protect the health of the patient.

33. Copies of an incarcerated person's medical details are provided to the inmate, their housing unit, and the records office for placement in the inmate file.

34. Furthermore, when the issue addressed by detail requires immediate attention, health care staff inform the relevant housing unit staff by phone.

35. Records of these phone calls are to be kept in logbooks and the incarcerated person's medical file.

36. These determinations are recorded as "medical details" or "special accommodations" depending on the length the accommodation is necessary and can include:

    a.  Durable medical equipment;

    b.   Housing restrictions;

    c.  Activity restrictions; or

d.  Other appropriate accommodations.

37. On February 4, 2019, Mr. Kaercher was issued a medical detail for his cane. **Exhibit 1, February 4, 2019, Medical Detail**.

38. On February 7, 2019, Mr. Kaercher was issued a medical detail for a bottom bunk. **Exhibit 2, February 7, 2019, Medical Detail**.

39. On February 14, 2019, Mr. Kaercher's bottom bunk and medical details were renewed for another six months. **Exhibit 3, February 14, 2019, Medical Detail**.

40. DRF housing unit staff were informed of Mr. Kaercher's details by RN April D. Allenbaugh.

41. On March 14, 2022, RN Reuben Babbitt issued Mr. Kaercher special accommodation details bottom bunk, a wheelchair, and a cane. **Exhibit 4, March 14, 2022, Special Accommodations**.

42. On March 18, 2022, Stephanie Wuest issued Mr. Kaercher an identical special accommodations order. **Exhibit 5, March 18, 2022, Special Accommodations**.

43. Mr. Kaercher began experiencing complications from his surgery, including a urinary tract infection, and on May 4, 2022, Stephanie Wuest extended his bottom bunk detail indefinitely and issued special accommodations for a

catheter bag, elevator, and "Ground Floor Room-No Stair Steps". **Exhibit 6, May 4, 2022, Special Accommodations**.

44. These special accommodations were reissued by Stephanie Wuest two weeks later on May 19, 2022. **Exhibit 7, May 19, 2022, Special Accommodations**.

45. Again, these special accommodations were reissued on May 24, 2022, and June 2, 2022. **Exhibit 8, May 24, 2022, Special Accommodations**; **Exhibit 9, June 2, 2022, Special Accommodations**.

46. Per policy, these details were provided to Mr. Kaercher's housing unit staff by the DRF healthcare staff.

47. Furthermore, Mr. Kaercher either personally handed each Defendant a copy of the details and/or ensured that copies of his medical detail were placed in the control room where all corrections officers in his unit spend time.

48. For example:

    a. On March 14, 2022, Mr. Kaercher provided a copy of his medical detail to Defendants Dill, C/O Shutt, and Rydahl. This copy was then placed in a conspicuous place in the control room.

    b. On March 15, 2022, Mr. Kaercher provided a copy of his medical detail to Defendant Allen.

   c.  On May 4, 2022, Mr. Kaercher gave Defendant Allen a copy of his new special medical accommodation restricting him to a ground floor cell and requiring that he have access to an elevator.

   d.  Thereafter, Mr. Kaercher showed Defendants Leonard, Schrader, Sgt. Shutt, Gregory, Krammer, Ruthbum, Lott, Kohn, White, C/O Shutt, Johnston, and Rydahl the new special medical accommodation.

49. Mr. Kaercher also spoke with each Defendant regarding his medical details and the difficulties he was experiencing with pain and mobility.

50. For example:

   a.  On, March 14, 2022, Mr. Kaercher spoke with Defendants Dill, C/O Shutt, and Rydahl about his special medical accommodation detail;

   b.  On, or about, May 4, 2022, Mr. Kaercher spoke with Defendant Allen about his new special medical accommodation and when Defendant Allen refused to honor it, raised the issue with Defendant Blair who also refused to take any action.

   c.  Thereafter, Mr. Kaercher spoke with Defendants Leonard, Schrader, Sgt. Shutt, Gregory, Krammer, Ruthbum, Lott, Kohn, White, C/O Shutt, Johnston, and Rydahl about his new special medical accommodation. They all refused and/or failed to honor it.

51. On a daily basis Mr. Kaercher spoke with Defendants regarding his need to be transferred to the 500 unit, which was handicap accessible, and the other requirements of his special medical accommodation detail.

52. In one conversation, Defendant Allen threatened to send Mr. Kaercher to segregation if he continued to "bug him" about being transferred to a handicap accessible housing unit.

53. Jacob Dominy, another incarcerated person and witness to many of the allegations in this complaint, states in his declaration that when Mr. Kaercher would inform the Defendants of his medical issues and the necessary accommodations, they would tell him it was his problem, not theirs. **Exhibit 10, Declaration of Jacob Dominy**.

54. Defendants were also both informed by the medical staff at DRF of Mr. Kaercher's special medical accommodation detail and able to independently view Mr. Kaercher and objectively confirm his ongoing physical problems.

55. Mr. Kaercher was not provided with a ground floor room as his detail, and health, required.

56. Throughout the time Mr. Kaercher was being denied his medical accommodations, he repeatedly asked Defendants to have him moved to the handicap unit.

57. Specifically, Mr. Kaercher asked Defendants Leonard, Shutt, Lott, Gregory, Krammer, Ruthbum, White, and Blair to have him moved but none of them did anything to have him moved and give effect to his medical accommodations.

58. When Mr. Kaercher would ask Defendant Blair to have him moved, Defendant Blair's response was generally that "he would see what he could do."

59. Throughout this time, Mr. Kaercher's physical limitations and the need for a transfer to the handicap unit were obvious to even a casual observer.

60. Defendants clearly were aware that Mr. Kaercher had severely limited mobility because they assigned another incarcerated person, Michael Wagner, to assist him. **Exhibit 11, Declaration of Michael Wagner**.

61. Mr. Kaercher was also provided with a paid wheelchair aid, Jacob Dominy. **Exhibit 10, Declaration of Jacob Dominy**.

62. Even after Mr. Kaercher was provided with a wheelchair aid and assistance with obtaining his medication, every day he was forced to walk approximately 150 feet from his cell to a staircase and then walk down a flight of stairs before he could get into his wheelchair before reversing the process.

63. Mr. Kaercher had to do this at least three times a day *just for his medication*.

64. If Mr. Kaercher needed to be outside of his cell for any other reason including for showers, church, healthcare, the law library, or for any type of recreation he had to traverse the stairs additional times.

65. To minimize the amount of time on his feet, and moving up and down the stairs, Plaintiff skipped a great deal of yard time, missed callouts, began to shower only two or three times a week rather than daily, and began missing phone calls with his family.

66. On June 3, 2022, Mr. Kaercher fell down the stairs in Unit 1200 severely reinjuring his spine and causing him to be confined to a wheelchair.

67. It was only after this injury that Mr. Kaercher was transferred to a handicap unit with an elevator and placed in a cell on the ground floor.

68. On October 26, 2022, Mr. Kaercher had a surgery to repair damage from his fall.

69. This surgery involved the fusion of his vertebrae and installation of a cage over another vertebrae.

70. As a result of his fall and subsequent surgery, Mr. Kaercher needed to take narcotic painkillers to mitigate the excruciating pain.

71. Mr. Kaercher has been involved in the MAT program for addiction recovery since June 3, 2021.

72. Mr. Kaercher was first treated with Suboxone and then Sublocade.

73. These medications are designed to help prevent opiates from binding to receptors in the brain, helping recovering addicts mitigate cravings and reducing the effects of opiates.

74. Mr. Kaercher had been fully compliant with the program and his recovery was progressing well.

75. After his first surgery, Mr. Kaercher was put on Norcos which did not have negative impacts on his addiction recovery.

76. Mr. Kaercher was also able to continue his Sublocade treatment throughout this ordeal, until his surgery on October 25, 2022, to repair the injuries he sustained by falling.

77. To recover from this more invasive surgery, Mr. Kaercher was prescribed Percocet and was not able to take continue his Sublocade treatment.

78. This reversed all the gains Mr. Kaercher had made during his drug abuse treatment program, forcing him to go back to square one on his road to recovery from addiction.

79. When Mr. Kaercher returned to the MAT program, he informed his medical provider that he was experiencing withdrawal symptoms.

80. The use of opioids also gave Mr. Kaercher negative side effects including insomnia and gastrointestinal issues.

81. Beyond the pain, suffering, and difficulty engaging in the activities of daily living that Mr. Kaercher suffered while Defendants refused to provide him with the medical accommodations he had and the injury from his fall, Mr. Kaercher suffered significant mental and emotional injuries.

82. Prior to falling, Mr. Kaercher experienced frustration and embarrassment from being forced to rely on people to help him in highly intimate activities, such as taking a shower or going to the bathroom.

83. Mr. Kaercher was required to rely on other people for showering and going to the bathroom because the unit he was in lacked the necessary accommodations for persons with restricted mobility, such as grab bars in the bathrooms and showers.

84. Mr. Kaercher also experienced more feelings of depression, hopelessness, and frustration as he was denied even the limited modicum of independence incarcerated persons are allowed. Instead of being able to control some aspects of his own life, Mr. Kaercher was forced to rely on the help of other incarcerated persons because Defendants refused to help him.

85. After falling, even though the move to the 500 unit granted Mr. Kaercher greater independence, he began having stronger feelings of depression and anxiety because he was not sure if he would ever be able to walk again.

86. Plaintiff still suffers from significant side effects of his fall, including mobility limitations (including the inability to touch his toes), significant pain, the inability to lift anything over 45 pounds, and the inability to lift anything over 25 pounds above his head.

87. Since his release, Mr. Kaercher has been unable to obtain employment paying equivalent wages to that of a welder and is unable to work as a welder due to his injuries from the incident complained of in this complaint.

88. Mr. Kaercher has therefore lost significant past and future income as a result of Defendants' conduct.

### COUNT I: 42 U.S.C. § 1983 – Eighth Amendment

89. Plaintiff realleges and reincorporates the preceding paragraphs as if fully restated herein.

90. Each Defendant was aware of Mr. Kaercher's serious medical condition including the pain it caused him and significant limits it placed on his mobility.

91. Defendants' knowledge came from multiple sources including:

   a. Being present when Mr. Kaercher returned from his back surgery or were otherwise aware that it had occurred due to his absence and speaking with colleagues, reviewing documents provided by the DRF medical staff, and/or speaking with Mr. Kaercher;

b.  Communications with the medical staff at DRF;

c.  Copies of the special medical accommodation details handed to them by Mr. Kaercher;

d.  Copies of Mr. Kaercher's special medical accommodation details being placed in conspicuous places in the control room;

e.  Conversations with Mr. Kaercher and their colleagues;

f.  Watching Mr. Kaercher struggle to get around, and in particular, go up or down the stairs.

92. Thus, Defendants were not only aware of Mr. Kaercher's objective medical needs, they were also aware of the specific accommodations medical staff had determined he needed.

93. Despite this knowledge, Defendants refused – over a period of months – to honor Mr. Kaercher's special medical accommodation details and to ensure that he was provided with a safe living environment.

94. Each Defendant had the ability to request and/or authorize a cell reassignment for Mr. Kaercher to the ground floor, or even a cell that was not the furthest from the stairs.[1]

---

[1] Merely moving Mr. Kaercher closer to the stairs would have been insufficient. Plaintiff notes this here simply to emphasize the egregiousness of Defendants' failure.

95. Each Defendant had the ability to request and/or authorize a transfer of Mr.
Kaercher to the 500 unit which was handicap accessible.

96. Defendants chose not to do so.

97. As a result of this decision, Mr. Kaercher suffered significant ongoing
physical and mental suffering before and after his fall on June 3, 2022.

98. After Mr. Kaercher's fall, he was required to undergo another invasive surgery
and continues to experience significant limitations on his ability to engage in
the activities of daily living.

99. Mr. Kaercher may never recover the same mobility, strength, and
functionality that he had prior to his fall on June 3, 2022.

**COUNT II: 42 U.S.C. § 1983 –Americans with Disabilities Act 42 U.S.C. §
12131 *et seq*. (Title II)**

100. Plaintiff realleges and reincorporates the preceding paragraphs as if
fully restated herein.

101. 42 U.S.C. § 1983 provides a cause of action against any person, acting
under the color of law, who "causes to be subjected, any citizen of the United
States . . . to the deprivation of any rights, privileges, or immunities secured
by the Constitution and laws, shall be liable to the party injured . . ."

102. The Americans with Disabilities Act ("ADA") is a "law" as defined in
42 U.S.C. § 1983.

103.     The ADA provides persons with certain rights related to disability and

reasonable accommodations.

104.     Defendants refused to provide Mr. Kaercher with reasonable

accommodations as required by the ADA thereby causing him to be deprived

of the rights secured by that act.

105.     Defendants are therefore liable in their individual capacities to Mr.

Kaercher for violating his rights secured under that act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court adjudge and

declare that Defendants violated his rights in the manner set forth in this complaint

and award Plaintiff:

a) Nominal, compensatory, and punitive damages for the violations of Mr.

Kaercher's rights;

b) An injunction requiring Defendants to ensure that Mr. Kaercher continues to

be housed in a place that accommodates his medical needs;

c) An injunction requiring Defendants to provide and/or receive training

regarding the appropriate way to treat, protect, and/or handle persons with

serious mobility limitations, such as Mr. Kaercher;

d) Reasonable attorney's fees pursuant to 42 U.S.C § 1988;

e) Any other relief this Court deems just and proper.

## JURY DEMAND

Plaintiff hereby requests a trial by jury.


                                    Respectfully Submitted,

Dated: February 20, 2025            /s/ Paul Matouka
                                    Paul Matouka (P 84874)
                                    Oliver Bell Group
                                    50 W. Big Beaver Rd.
                                    Suite 200
                                    Troy, MI 48084
                                    (284) 327-6556
                                    notifications@oliverlawgroup.com